# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

PATRICK PYJEK,

      Plaintiff,

v.                                Case No:  2:16-cv-538-FtM-CM

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____

## ORDER

Plaintiff Patrick Pyjek seeks judicial review of the denial of his claims for disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") by the Commissioner of the Social Security Administration ("Commissioner"). The Court has reviewed the record, the briefs and the applicable law.  For the reasons discussed herein, the decision of the Commissioner is **REVERSED** and this matter is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four.

## I.  Issues on Appeal[1]

Plaintiff raises three issues on appeal: (1) whether substantial evidence supports the finding of the Administrative Law Judge ("ALJ") that Plaintiff does not

---

[1] Any issue not raised by Plaintiff on appeal is deemed to be waived.  *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

meet a listing; (2) whether the ALJ properly evaluated the opinions of Plaintiff's treating and State agency physicians; and (3) whether substantial evidence supports the ALJ's determination of Plaintiff's residual functional capacity ("RFC") with respect to his mental impairment and need for a hand-held assistive device. Plaintiff also requests, on remand, that the Court direct the Commissioner to assign the case to another ALJ.

## II.  Procedural History and Summary of the ALJ's Decision

Plaintiff filed his applications for DIB and SSI on January 7, 2011 and January 13, 2011, respectively. Tr. 120, 126. Plaintiff's applications allege disability beginning on March 8, 2008 due to his ankle surgeries and depression because of his injuries. Tr. 122, 126, 166. The claims initially were denied on May 5, 2011 and upon reconsideration on July 6, 2011. Tr. 72, 78, 88, 90. Plaintiff requested and received a hearing before ALJ Larry Butler on February 22, 2013, during which he was represented by an attorney. Tr. 30-58. As of the date of the hearing, Plaintiff was twenty-two years of age and had a high school education. Tr. 34. Plaintiff testified at the hearing. Tr. 32. The ALJ issued an unfavorable decision on September 10 2014. Tr. 12-22.

The ALJ first discussed in detail Plaintiff's motion for recusal, denied the motion and declined to withdraw. Tr. 12-14. Next, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. Tr. 17. At step one, the ALJ concluded that Plaintiff has not engaged in substantial gainful activity since March 8, 2008, the alleged onset date. *Id.* At step

two, the ALJ found that Plaintiff "has the following severe impairments: problems with ankles. . . ." *Id.* At step three, the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.916)." Tr. 18. The ALJ stated he reviewed all the applicable listings, including Listing 1.00, and found that the "the medical evidence of record does not establish that any of the claimant's severe impairments meets or equals the requirements of any of the listing of impairments herein." *Id.* Taking into account the effect of Plaintiff's impairments, the ALJ determined that Plaintiff has the RFC to perform "the full range of sedentary work[2] as defined in 20 CFR 404.1567(a) and 416.967(a)." Tr. 19. Next, the ALJ found that Plaintiff is unable to perform his past relevant work as an aluminum installer, which is a semi-skilled position and requires medium strength. Tr. 20. The ALJ concluded that considering Plaintiff age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, and thus found that he has not been disabled from March 8, 2008 through the date of the decision. Tr. 21. On May 10, 2016, the

---

[2] The regulations define "sedentary work" as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

Appeals Council denied Plaintiff's request for review. Tr. 1-7. Accordingly, the ALJ's September 10, 2014 decision is the final decision of the Commissioner. Plaintiff filed an appeal in this Court on July 6, 2016. Doc. 1. Both parties have consented to the jurisdiction of the United States Magistrate Judge, and this matter is now ripe for review. Docs. 10, 12.

### III.    Social Security Act Eligibility and Standard of Review

A claimant is entitled to disability benefits when he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to either result in death or last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The Commissioner has established a five-step sequential analysis for evaluating a claim of disability. *See* 20 C.F.R. §416.920. The Eleventh Circuit has summarized the five steps as follows:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in "significant numbers in the national economy."

*Atha v. Comm'r Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (citing 20 C.F.R. §§ 416.920(a)(4), (c)-(g), 416.960(c)(2); *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011)). The claimant bears the burden of persuasion through step four; and, at step five, the burden shifts to the Commissioner. *Id.* at 933; *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The scope of this Court's review

is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988) (citing *Richardson v. Perales*, 402 U.S. 389, 390 (1971)). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a scintilla, *i.e.*, evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (finding that "[s]ubstantial evidence is something more than a mere scintilla, but less than a preponderance") (internal citation omitted).

The Eleventh Circuit has restated that "[i]n determining whether substantial evidence supports a decision, we give great deference to the ALJ's fact findings." *Hunter v. Soc. Sec. Admin., Comm'r,* 808 F.3d 818, 822 (11th Cir. 2015) (citing *Black Diamond Coal Min. Co. v. Dir., OWCP,* 95 F.3d 1079, 1082 (11th Cir. 1996)). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the preponderance of the evidence is against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). "The district court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the decision." *Foote*, 67 F.3d at 1560; *see also Lowery v. Sullivan*, 979

F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings). It is the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. *Lacina v. Comm'r, Soc. Sec. Admin.*, 606 F. App'x 520, 525 (11th Cir. 2015) (citing *Grant v. Richardson,* 445 F.2d 656 (5th Cir.1971)).

## IV.    Background and Relevant Medical History

Plaintiff is a thirty-three-year-old male, born on May 2, 1984. Tr. 122. Until March of 2008, he worked for about eight years as an aluminum installer for a construction company. Tr. 36. On March 8, 2008, Plaintiff was squatting on the balls of his feet using a saw while working on a pool fence when he was struck from behind by a falling palm tree. Tr. 52. The tree, which was about eleven inches in diameter and twenty-five feet tall, blew over and collided with the top of his back, between his shoulder blades.[3] *Id.* The force of the blow pushed Plaintiff to the ground and pinned him underneath the husk of the tree, causing injuries to his ankles. Tr. 52, 310.

The same day, Plaintiff presented to Gulf Coast Hospital, where he was examined by Dr. Robert Follweiler, D.O., and Dr. Thomas Schaar, M.D. Tr. 309, 311-12. At Gulf Coast, x-rays and computed tomography ("CAT") scans of Plaintiff's right ankle showed that he had fractured his talus bone and that "tiny bone

---

[3] Several medical records indicate that the tree fell directly onto Plaintiff's ankles (*see*, *e.g.*, Tr. 311, stating that "a palm tree blew over and landed on his ankles"); yet Plaintiff testified in his administrative hearing that, in fact, the tree landed near his shoulders and knocked him to the ground. Tr. 52.

fragments" had splintered off around the inside of the upper right ankle. Tr. 309, 316. Plaintiff's left ankle sustained several, less serious, small fractures. Tr. 309, 311-12, 314. He also had cuts on his lip and swelling in his ankles, but no numbness or tingling. Tr. 309, 311. Dr. Stanley Alexander, M.D., also of Gulf Coast Hospital, confirmed the initial findings. Tr. 547-49. Dr. Alexander documented swelling and numerous small fracture fragments in both ankles as well as some possible joint separation. Tr. 550-51. Dr. Alexander's prognosis was that these injuries may cause Plaintiff joint instability. *Id.*

Following Dr. Follweiler's and Dr. Alexander's examinations, Plaintiff was admitted to Gulf Coast Hospital for pain control — more for his left ankle than his right — and fitted with fracture braces. Tr. 310. While Plaintiff was in the braces, Dr. Follweiler determined Plaintiff could fully weight bear on his left side and partially weight bear on his right, although Plaintiff had trouble with ambulation and was in pain. *Id.*

Two days later, on March 10, 2008, Plaintiff was mobile enough with a walker to be released from the hospital. Tr. 310. On Plaintiff's discharge date, Dr. Follweiler deemed Plaintiff neurovascularly intact and did not think any surgeries were necessary; he instead suggested that Plaintiff take aspirin and elevate and apply ice to his ankles. Tr. 310, 312. During his two-day hospital stay, Plaintiff was kept on a blood-thinning medication, and Dr. Follweiler gave Plaintiff a prescription for Vicodin upon discharge. Tr. 312. He also noted that Plaintiff may be out of work for a while. *Id.*

On March 18, 2008, Plaintiff was referred to Dr. Jeremy Schwartz, M.D., at Orthopedic Specialists of SW Florida ("Orthopedic Specialists"). Tr. 768. Dr. Schwartz confirmed Plaintiff's talus fracture in his right ankle and a sprain and small tearing in his left foot. *Id.* Dr. Schwartz's examination also revealed bilateral swelling and a mild amount of bruising. *Id.* Dr. Schwartz suggested that Plaintiff remain in a boot — non-weight-bearing — and out of work for about eight weeks. Tr. 769. Plaintiff used both a wheelchair and walker for the next several weeks to accommodate his ankle injuries. Tr. 560.

On April 2, 2008, Plaintiff reported to Dr. Paul Fuchs, D.O., of Orthopedic Specialists that he was experiencing pain in his neck and back and discomfort near his right shoulder blade. Tr. 560, 572. Although previous x-rays had shown no signs of spinal abnormalities, Dr. Fuchs diagnosed Plaintiff with an upper back sprain and recommended his spine be checked via magnetic resonance imaging ("MRI"). Tr. 560, 566. Throughout this period, Plaintiff continued to take both Vicodin and Celebrex for pain. Tr. 570.

Plaintiff presented to Dr. Schwartz's office on April 21, 2008, complaining of stiffness in his left toes. Tr. 766–67. Dr. Schwartz recommended Plaintiff start physical therapy for the right ankle's range of motion and begin bearing more weight on the left foot. Tr. 767. Dr. Schwartz also stated Plaintiff should not work for another month. *Id.*

A week later on April 28, 2008, Plaintiff underwent a pair of MRIs at LMR Imaging–Riverwalk to examine his spine. Tr. 561-62. The thoracic spine MRI

came back negative, with no evidence of disc protrusion, narrowing of the spinal canal or cord compression. Tr. 562. The cervical spine MRI demonstrated "minimal" bulging of the disc at C4-5 and "tiny" central disc protrusion at the C3-4 disc space. Tr. 561.

Plaintiff returned to Dr. Schwartz for another examination on May 20, 2008 after two sessions of physical therapy. Tr. 762. There were insufficient changes in Plaintiff's condition for Dr. Schwartz to suggest anything beyond what he had recommended a month previously, except he encouraged a gradual increase of weight bearing on Plaintiff's right side as well. *Id.*

On May 27, 2008, Dr. Fuchs examined the MRIs and determined that Plaintiff had reached maximum medical improvement for his spine. Tr. 559. Plaintiff's spinal pain had resolved itself during the previous month, and Dr. Fuchs stated that Plaintiff had, as far as his spine was concerned, "no major limitations," and that his "permanent impairment would be 2%." *Id.*

On July 7, 2008, following persistent pain in his right ankle, Dr. Schwartz injected pain medications into the talus area of Plaintiff's right ankle. Tr. 759. An x-ray conducted the same day revealed there was also some hardening in the right ankle. *Id.* Plaintiff's general ankle range of motion was good, yet the range of motion for the subtalar joint was somewhat abbreviated. *Id.* Dr. Schwartz said that an ankle fusion surgery may be necessary in the future. Tr. 760.

After continued physical therapy, Plaintiff went back to Dr. Schwartz on July 25, 2008; Plaintiff stated that the effects of the injection had worn off, and the pain

had returned to his right ankle. Tr. 758. Plaintiff also complained of pain on top of his left foot. *Id.* Dr. Schwartz suggested an ankle/foot orthosis brace and ordered a CAT scan and MRI, each of which took place in September 2008. Tr. 756, 758, 771. The CAT scan of Plaintiff's right ankle revealed that his talus fracture was not healing properly. Tr. 756. The MRI of his left foot revealed an abnormal fluid buildup between the fourth and fifth tarstometatarsal ("TMT") joints. Tr. 757.

On a follow-up visit to Dr. Schwartz on September 17, 2008, Plaintiff continued to complain of pain around his right ankle. Tr. 756. At the time, Plaintiff was wearing an ankle brace, which helped mobility but apparently did little to ease the pain of walking on his right foot. *Id.* Dr. Schwartz stated that Plaintiff's range of motion in his right ankle was within five degrees of normal, yet he wrote that if Plaintiff's pain persisted, then a fusion surgery may be required. Tr. 756-57. Dr. Schwartz also suggested that Plaintiff get a second opinion. Tr. 757.

By October 29, 2008, Plaintiff had not received a second opinion, but he was still experiencing pain in his right ankle when standing or walking in his brace. Tr. 754. Dr. Schwartz confirmed that Plaintiff's talus fracture had not healed and that Plaintiff was starting to experience osteoarthritis. *Id.* Dr. Schwartz stated he did not think a subtalar fusion surgery would be necessary; he instead suggested a hardware-less incision in the joint to remove any bone fragments and clean up the area under Plaintiff's right talus. Tr. 755.

Plaintiff underwent a surgical repair of the right talus on December 4, 2008. Tr. 741. On December 15, 2008 Dr. Schwartz wrote that Plaintiff was improving

nicely and that, with splints, Plaintiff already was capable of non-weight bearing mobility; he also prescribed Celebrex for joint pain. Tr. 753. Further evaluation by Dr. Schwartz on January 14, 2009 stated that Plaintiff "has done very well. He is still having some pain and some instability-like symptoms. He is in a regular shoe weightbearing." Tr. 752.

During January and February 2009, at the referral of Dr. Schwartz, Plaintiff attended a series of rehab sessions — at least seventeen of them — at Patrick Saidi Physical Therapy. Tr. 624–25. Therapist Patrick Saidi, M.P.T., treated Plaintiff with therapeutic exercises, joint mobilization, ultrasound, electrical stimulation and cold therapy. Tr. 624. As of February 20, 2009, however, there had "not been any increases in Subtalar joint motion despite aggressive joint mobilization." *Id.* Although Plaintiff's pain had decreased from a six or seven out of ten to a four out of ten during the course of the therapy, he "continue[d] to complain of pain with ambulation greater than 10 minutes." *Id.*

On March 2, 2009, Dr. Schwartz and Plaintiff met again. Tr. 750. Plaintiff was experiencing pain from arthritis that had developed around his right talus. *Id.* He also complained of pain coming from the mostly healed fracture on his left foot between his and fourth and fifth TMT joints. Tr. 751. Dr. Schwartz considered Plaintiff's previous job too demanding for him at this time and suggested a Functional Capacity Exam ("FCE") to determine Plaintiff's physical capabilities and limitations. *Id.* A subsequent check-up on March 18, 2009 revealed little different from the one two weeks prior, yet on this date, Dr. Schwartz injected pain medications into

Plaintiff's left TMT joints.   Tr. 749.

On April 1, 2009, Dr. Schwartz assessed Plaintiff's condition as improving, although Plaintiff still had swelling and limited subtalar range of motion on his right side, as well as pain over the fourth and fifth TMTs on his left side.   Tr. 428. Plaintiff by this time had finished his formal physical therapy on his right ankle but had received no therapy on his left foot.   *Id.*   To help with Plaintiff's left-foot TMT pain, Dr. Schwartz injected pain medications into the top of Plaintiff's left foot.   Tr. 428.   The next day, April 2, 2009, Dr. Schwartz prepared a supplement to the previous day's assessment in which he discussed Plaintiff's recently conducted FCE. Tr. 746.   The FCE placed Plaintiff at medium duty, with a 14 percent permanent disability rating, due to right-ankle stiffness.   *Id.*   Dr. Schwartz also placed Plaintiff on MMI with a 14% permanent disability rating because of both of his ankles.   *Id.*

Plaintiff returned to Dr. Schwartz on May 13, 2009 for a follow-up evaluation. Tr. 741.   Most of Plaintiff's pain was coming from his left foot rather than his right ankle.   *Id.*   Dr. Schwartz noted osteoarthritis in both the fourth and fifth TMT joints of Plaintiff's left foot and around the talus of his right ankle.   Dr. Schwartz gave Plaintiff Voltaren gel — a topical pain reliever — and suggested physical therapy for the left side.   Tr. 742.   Plaintiff engaged in about eighteen physical therapy sessions during early summer of 2009.   Tr. 739.

On June 17, 2009, Plaintiff saw Dr. Schwartz and told him that the Voltaren was not helpful enough to justify continued usage.   *Id.*   On this date, Dr. Schwartz documented stiffness and pain in Plaintiff's left fourth and fifth TMT joints and mild

swelling on his right ankle, which also had subtalar arthritis. *Id.* Dr. Schwartz recommended continued therapy and provided a prescription for rocker-bottom shoes. Tr. 740.

After two months of continued physical therapy, on August 19, 2009, Plaintiff met again with Dr. Schwartz and said that the rocker-bottoms were helping with his mobility, but not the pain. Tr. 737. Plaintiff complained of a daily pain cycle, but said the pain was not persistent. *Id.* Dr. Schwartz wrote that Plaintiff was clear to work, per his FCE, and that he "has been MMI since 4/02/09 at a 14% disability range." *Id.* Dr. Schwartz decided to continue with therapy and hold off on any more injections for the time-being. *Id.*

Plaintiff returned to Dr. Schwartz on October 14, 2009 and complained of pain in both his right ankle and left foot; though the left foot was showing improvement. Tr. 736. Plaintiff sought an injection to help with pain in his right ankle, and Dr. Schwartz set up an injection appointment for the following month. *Id.* He also said Plaintiff's work status, as guided by the FCE, ought to remain unchanged at a medium level. *Id.* Dr. Schwartz performed the requested injection on November 4, 2009. Tr. 743. Dr. Schwartz injected pain medications into plaintiff's right ankle. *Id.*

On March 31, 2010, Plaintiff visited Dr. Schwartz again; Plaintiff said that his improvement had plateaued and the pain in his right ankle and left foot persisted. Tr. 430. Dr. Schwartz suggested it may be time for a subtalar fusion surgery on Plaintiff's right ankle. Tr. 431. He also injected Plaintiff's left fourth/fifth TMT

joints with pain medications. *Id.* Plaintiff saw Dr. Schwartz on June 23, 2010 to plan for the upcoming surgery. Tr. 444. Dr. Schwartz noted that Plaintiff continued to experience swelling, pain and synovitis in his right ankle. *Id.* Plaintiff's left foot, furthermore, had osteoarthritis, and the region over the fourth and fifth TMT joints was tender to the touch.[4] *Id.* Dr. Schwartz wanted to inject platelet-rich plasma into Plaintiff's left foot at this time, but he had not yet received authorization to do so. *Id.*

On July 1, 2010, Dr. Schwartz performed a right subtalar arthrodesis to increase the amount of fusing to the area underneath Plaintiff's right talus. Tr. 325. Dr. Schwartz also drilled a hole into the talus and injected the void with platelet-rich plasma. Tr. 326. During the surgery, Schwartz noted significant amounts of scarring and arthritis. Tr. 325. The surgery yielded no complications. Tr. 326. As for Plaintiff's left foot, Dr. Schwartz did not conduct any surgery, yet he did inject platelet-rich plasma into Plaintiff's left mid-foot. *Id.*

Eleven days later on July 12, 2010, Plaintiff saw Dr. Schwartz for his first post-operative examination. Tr. 442. Showing pain but improvement, Plaintiff was splinted and restricted to non-weight bearing mobility, although he was permitted to walk for the purposes of evaluation. *Id.* Dr. Schwartz then had Plaintiff fitted for a boot cast. *Id.* On August 3, 2010, Plaintiff visited Dr. Schwartz again for

---

[4] Dr. Schwartz also noted during this visit that Plaintiff had "posttraumatic subtalar osteoarthritis on the left," although throughout the rest of the record, the primary impairments on Plaintiff's left side came from either his third and fourth TMT joints or his toes, not his talus. *See, e.g.*, Tr. 520, 730.

examination and x-rays.  Tr. 440.  Plaintiff was "doing well" and showed healed incisions and no swelling.  *Id.*  Dr. Schwartz suggested that Plaintiff stay in his non-weight bearing cast for another month, at which point he recommended Plaintiff begin formal physical therapy.  Tr. 441.  On August 31, 2010, Plaintiff, who was now getting around with the aid of boot and crutches, presented to Dr. Schwartz again.  Tr. 438.  There were no abnormalities and all seemed to be progressing normally.  *Id.*  Dr. Schwartz recommended formal therapy and progressive weight bearing for Plaintiff, as well as compression socks to help reduce swelling.  *Id.*

On September 14, 2010, Plaintiff attended his first session of physical therapy at Sports Specialty & Rehab Center.  Tr. 623.  The stated goals for the next two months included an 80 percent decrease in pain, a 1 cm decrease in swelling, an improvement in both up and down ankle extension by ten degrees, an achievement of 80 percent strength for both up and down ankle extension, the ability to ambulate without crutches or boots and independence with a home exercise program.  *Id.*  For the next two months, Plaintiff visited Sports Specialty two to three times each week and also engaged in the accompanying home exercise program.  Tr. 617–23.

By October 5, 2010, Plaintiff had abandoned the crutches and was ambulating with boot and cane.  Tr. 436.  On this day, he saw Dr. Schwartz, who stated that Plaintiff was doing well; Dr. Schwartz recommended Plaintiff start using regular shoes and weight bearing fully.  *Id.*  Plaintiff saw Dr. Schwartz again on November 3, 2010.  Tr. 434.  Dr. Schwartz commented that in the four months since surgery, Plaintiff "continues to progress nicely.  He is in a regular shoe."  *Id.*  Plaintiff was

continuing formal therapy, as he had for more than a month at this point, and Dr. Schwartz ascertained that Plaintiff was suitable for light work.   Tr. 435.

On November 12, 2010, Plaintiff was discharged from his two-month therapy program, having had fully met five of his six goals and partially achieved the sixth Tr. 617.   The fully met goals included an 80 percent decrease in pain, a 1 cm decrease in swelling, an achievement of 80 percent strength for both up and down ankle extension, the ability to ambulate without crutches or boots and independence with a home exercise program.   *Id*.   The goal he partially achieved was an improvement in both up and down ankle extension by ten degrees.   *Id*.

Nearly half a year after the July procedure, Plaintiff saw Dr. Schwartz for a check-up on Dec. 15, 2010.   Tr. 432.   Plaintiff, who was neurovascularly intact, was "doing well in a regular shoe," yet the left foot featured some arthritis in the fourth and fifth TMT joints and the emergence of a benign bone protrusion.   *Id.*   Dr. Schwartz at this time recommended the continued use of rocker-bottom shoes and light-duty labor, pending another upcoming FCE.   Tr. 433.

Plaintiff underwent an FCE on January 18, 2011, which determined that Plaintiff fell into the *medium* physical demand category, characterized by the ability to exert twenty to fifty pounds occasionally, ten to twenty-five pounds frequently and ten pounds constantly.   Tr. 371-72.   In particular, along the four-point ordinal scale that includes *never*, *occasional*, *frequent* and *constant*, Plaintiff scored as follows: sitting, standing, kneeling, forward bending, forward reaching, overhead reaching and grasping each received a score of *frequent*, which encompasses 34 to 66 percent

of a typical, eight-hour working day. *Id.* Sitting, walking, climbing, squatting and stooping were ascertained to fall at the *occasional* level, which is up to 33 percent of a typical, eight-hour working day. *Id.* No tasks fell into either the *never* or *constant* zones. *Id.*

On January 26, 2011, Plaintiff went to see Dr. Schwartz as a follow-up to the FCE. Tr. 355. Dr. Schwartz agreed in large part with the FCE, although he disagreed slightly in that he thought Plaintiff was capable only of occasional kneeling, rather than frequent kneeling, as suggested by the FCE. *Id.* Dr. Schwartz found that on Plaintiff's right side, there was "arthrodesis subtalar joint in about 5 degrees of valgus" — or a slight outward angling. *Id.* Furthermore, there was between five and ten degrees missing from the right ankle's overall range of motion. *Id.* On the left side, Dr. Schwartz noted a moderate amount of osteoarthritis over the midfoot area, coupled with an abridged range of motion. *Id.* Overall, Dr. Schwartz's diagnosis was right post-traumatic subtalar arthritis and left foot arthritis. *Id.* He also wrote that Plaintiff had achieved maximum medical improvement and was suited for medium-duty work; specifically, "he will have a 44% lower extremity disability combined from both legs, which will add up to an 18% total body disability." Tr. 355.

About four months later, on June 1, 2011, Plaintiff returned to Dr. Schwartz complaining of left foot pain. Tr. 353. After examination, the doctor diagnosed Plaintiff with left midfoot arthritis near the fourth and fifth TMTs, right hallux rigidus and ankle syndovitis with antelateral impingement. Tr. 353-54. All else

looked fine; there was no ankle arthritis, fractures, dislocations or bony abnormalities, and all hardware was in place. Tr. 354. Dr. Schwartz authorized injections for the fourth and fifth TMTs, which were performed throughout summer 2011. Tr. 351. Plaintiff responded well to the injections, but he was still in pain. *Id.* He continued to function at medium-duty work status at this time. Tr. 353.

On August 24, 2011, Plaintiff returned to Dr. Schwartz with the same left foot pain, as well as a newer pain on his right foot. Tr. 351. The doctor diagnosed Plaintiff with posttraumatic subtalar arthritis, left foot arthritis and bilateral fourth and fifth TMT arthritis. *Id.* Dr. Schwartz commented at the time that Plaintiff "seems to do well with subtalar arthrodesis." *Id.* All evaluations came up normal except that Plaintiff experienced pain in the first metatarsophalangeal joint ("MTP"), and pain in the fourth and fifth TMT during palpitation and ambulation. *Id.* On this date, Plaintiff was administered three injections in the MTP and TMP areas. *Id.*

Plaintiff's next visit to Dr. Schwartz came on February 15, 2012, when Plaintiff complained of another new pain — one around the web space between the fourth and fifth toes of his left foot. Tr. 520. Dr. Schwartz stated the web space pain had existed for a few years, but that it had not been documented; and Plaintiff had, up to that point, "treated the other issues, which were more significant." *Id.* During this visit, Plaintiff alleged no discomfort in either the ankle or the fourth and fifth TMTs — the area that had been problematic in the past. Tr. 351. X-rays demonstrated that there was lateral deviation along three MTP joints of the left foot. Tr. 520.

There were no fractures, dislocations or other abnormalities. *Id.* Dr. Schwartz filed off a callous on Plaintiff's toe and recommended a toe spacer to help manage the pain. Tr. 520–21.

Plaintiff's subsequent appointment with Dr. Schwartz on March 12, 2012 revealed that Plaintiff's fifth digit on his left foot was a hammertoe. Tr. 518. Plaintiff said the toe spacer did not work and only made his toes numb. *Id.* Plaintiff was also feeling a tightness within three MTP joints of his left foot, which may have been catalyzed by the previously diagnosed lateral deviation within the same area. Tr. 518. Dr. Schwartz and Plaintiff then scheduled a three-stage surgery, one which would include metatarsal osteotomies, MTP dislocation repairs and hammertoe correction; Dr. Schwartz also provided Plaintiff with a warning that the surgery would turn Plaintiff's left pinky toe into a "stiff, sausage-like digit." Tr. 519. The surgery took place as planned on April 16, 2012. Tr. 524-25.

Plaintiff's first post-op check-up on April 27, 2012 showed that he was doing well. Tr. 516. There were no complications resulting from the procedure, and he had remained in a boot — with minimal weight bearing and periodic elevation — ever since. *Id.* X-rays showed that all pins and screws seemed to be in their proper places. *Id.* Dr. Schwartz then removed the sutures and put Plaintiff on a topical antibiotic. Tr. 517.

Plaintiff's May 22, 2012 visit to Dr. Schwartz was a virtual repeat of the previous one. Tr. 514. Plaintiff remained in a boot, and the incisions had healed; there was minimal swelling and he was neurovascularly intact. *Id.* All the

hardware in his ankle was holding in good position, and Plaintiff was "maintaining excellent correction." Tr. 514–15. The pins also were removed, yet the screws apparently remained in place. *Id.* Dr. Schwartz noted that the time had come to "wean him out of the boot." Tr. 515.

Plaintiff's final pre-scheduled, post-operation check-up with Dr. Schwartz came on June 27, 2012. Tr. 512. Plaintiff was experiencing "mild pain and swelling, but feels like he is greatly progressing his range of motion activities." *Id.* There was also a "great range of motion of the MTPs with no pain," and Plaintiff had returned to regular shoes. *Id.* Dr. Schwartz left Plaintiff at the same disability rating and work status, and he also provided another prescription for rocker-bottom shoes to take the pressure off his foot and ankle. Tr. 513.

On February 6, 2013, not long after he began a job transporting patrons to their homes from a sports bar, Plaintiff visited Dr. Schwartz and complained of pain in his right ankle and left forefoot, as well as stiffness in his left toes. Tr. 36, 719. An examination and x-rays illustrated right ankle synovitis and osteoarthritis, as well as left-foot stiffness in MTP joints two through five. Tr. 719. Dr. Schwartz then injected pain medication into Plaintiff's right tibiotalar joint. Tr. 718. Dr. Schwartz recommended formal physical therapy for the both the right ankle and left foot, as well as anti-inflammatory medication. *Id.* He also stated another right ankle arthroscopy may be necessary. Tr. 720.

## V. Discussion

### A. Whether substantial evidence supports the ALJ's decision that Plaintiff does not meet a listing.

Plaintiff first contends that his impairments met or at the least medically equaled Listings 1.02A and/or 1.03 for a period of at least twelve (12) months during the relevant time period, at minimum during March 2008 through April 2009, and the ALJ's decision finding otherwise is not supported by substantial evidence. Doc. 14 at 8-11; Doc. 18 at 2-3. The Commissioner responds that Plaintiff has failed to meet his burden. Doc. 15 at 4-9. The Commissioner argues that although Plaintiff suffered from severe ankle impairments, substantial evidence of record does not support that Plaintiff's condition resulted in his inability to ambulate effectively, or that such ability lasted for a continuous 12-month period from Plaintiff's onset date. Doc. 15 at 7-8.

In his decision and without stating which particular listings he considered or providing any explanation whatsoever as to his reasoning, the ALJ stated he reviewed "all the applicable listings including 1.00.[5]" Tr. 18. Without further discussion, however, the ALJ stated he reviewed the records and "for the reasons stated below" finds the medical evidence does not establish that any of Plaintiff's severe impairments meets or equals the requirements of any of the listings. *Id.* Presumably, the ALJ was referring to his discussion of Plaintiff's RFC, which as noted below, also is quite abbreviated. First, the Court finds that the ALJ should

---

[5] 1.00 is a category of listings of disorders of the musculoskeletal system, and includes eight specific listings, 1.01 through 1.08. Relevant here, section 1.00 defines ineffective ambulation and provides examples. 20 C.F.R. pt. 404, subpt. P, app.1, § 1.00(B)(2)(b)(1), (b)(2). Listings 1.02A and 1.03 are at issue here. 20 C.F.R. pt. 404, subpt. P, app.1, §§ 1.02A, 1.03.

have explicitly discussed Listings 1.02A and 1.03A. Second, the Court finds that the ALJ's conclusory statement regarding section 1.00 is not sufficiently clear to ensure meaningful review. Therefore, the Court orders reversal and remand on these grounds.

As noted above, the Eleventh Circuit has recognized that the ALJ must consider the listings in Appendix 1 as part of the five-step sequential disability determination process. *See Todd v. Heckler*, 736 F.2d 641, 642 (11th Cir. 1984) (per curiam). The Eleventh Circuit also has recognized, however, as noted by Plaintiff, that the ALJ's determination whether a claimant meets a listed impairment may be implicit in the ALJ's decision. *See Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) ("While Appendix 1 must be considered in making a disability determination, it is not required that the Secretary mechanically recite the evidence leading to her determination. There may be an implied finding that a claimant does not meet a listing."); Doc. 14 at 11.

Nevertheless, the Eleventh Circuit also has reiterated the "requirement that [the ALJ] state with at least some measure of clarity the grounds for his decision." *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (per curiam). The *Owens* court explained the basis for this requirement:

> We must continue to insist on [this requirement] so that we can perform the function entrusted to us in the administrative scheme. We are neither to conduct a de novo proceeding, nor to rubber stamp the administrative decisions that come before us. Rather, our function is to ensure that the decision was based on a reasonable and consistently applied standard, and was carefully considered in light of all the relevant facts.

*Id.* Finally, the Eleventh Circuit has admonished district courts to resist the temptation to evaluate the administrative record and "engage in direct fact finding" as that is "an affront to the administrative process." *McDaniel v. Bowen*, 800 F.2d 1026, 1032 (11th Cir. 1986). The *McDaniel* court explained:

> The Congressional scheme is that, governed by standards promulgated by Congress and interpreted by the courts, the administrator is to find the facts case by case and make the determination of presence or absence of disability, and that, in the course of judicial review, the courts are then to respect the administrative determination.

*Id.*

> The first listing that is at issue in this case, Listing 1.02A, provides:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b. . . .

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02A. The second listing at issue, Listing 1.03, provides, in relevant part:

> 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03. Both listings discuss the inability to "ambulate effectively," as defined in 1.00B2:

1.00B2a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason… The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months.

1.00B2b(1). Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

1.00B2b(2). Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B1-2(b)(2).

Applying the Eleventh Circuit principles discussed above, the Court finds that in this case there was sufficient evidence to require the ALJ to explicitly consider Listings 1.02A and 1.03, and to state the grounds for his decision with sufficient clarity to allow for meaningful review. As directed by the Eleventh Circuit, this Court resists the temptation to evaluate the administrative record itself and engage in direct fact finding. Although the ALJ ultimately may conclude that Listings 1.02A and 1.03 are not met, it is the role of the ALJ, not this Court, to decide that question in the first instance.

As noted by Plaintiff and outlined in detail in the Court's discussion of Plaintiff's medical records, Plaintiff required multiple surgeries and extensive physical therapy to both of his ankles from the accident in March 2008. For

at least six months after his accident he was wheelchair-bound, as the ALJ acknowledged. Tr. 19-20. After Plaintiff's surgery in December 2008, again he was in a wheelchair and could not weight-bear on his ankles. Tr. 741. As late as February 2009, Plaintiff continued to complain of pain with ambulation greater than 10 minutes. Tr. 624. In March 2009, Plaintiff still was receiving injections for pain, and it was not until April 2009 that a functional capacity exam showed Plaintiff could perform medium work. Tr. 746.

Accordingly, there was sufficient evidence to trigger a requirement that the ALJ explicitly consider these listings and Plaintiff's ability to effectively ambulate and explain his reasoning. Because of the ALJ's lack of explicit consideration of these listings and of any meaningful analysis, the Court is unable to determine even whether the ALJ considered Listings 1.02A and 1.03, or, if he did, on what basis he rejected their applicability. Although ultimately an ALJ may determine that these listings are not met, it is not for the Court to attribute that reasoning to the ALJ or to review the record and engage in direct fact finding. Thus, reversal and remand on this ground is required. On remand, both of these listings should be explicitly and adequately considered and Plaintiff's ability to ambulate fully discussed.

B.  *Whether the ALJ properly evaluated the opinion of Plaintiff's treating and State agency physicians*

Plaintiff argues that the ALJ committed reversible error by failing to properly consider, or in some cases even mention, the "multiple opinions" of Plaintiff's treating

physician, Dr. Schwartz.   Doc. 14 at 12.   Plaintiff states, for example, that during several periods of time Dr. Schwarz indicated that Plaintiff was totally unable to work due to his surgery and recovery from surgery.   *Id.* (citing Tr. 641, 643, 645, 647, 649). Plaintiff further argues that on other occasions Dr. Schwarz restricted Plaintiff in standing or walking.   *Id.*   Plaintiff further asserts the ALJ erred by assigning no weight to the opinions of the State agency consultants concerning Plaintiff's mental functioning without providing his rationale for rejecting the opinions.   Doc. 14 at 13. Plaintiff argues that this error was harmful because, "given Plaintiff's severe physical limitation to sedentary work, any further non-exertional restrictions severely limit the work base available to Plaintiff."   *Id.*

The Commissioner responds that the ALJ "specifically referenced Dr. Schwartz's many treatment records" when he discussed records from Orthopedic Specialists.   Doc. 15 at 11 (citing Tr. 20).   Further, the ALJ argues that the treatment records to which Plaintiff cites are not the most recent records, but were from October 2010.   *Id.*   More recent records, the Commissioner points out, reveal that Plaintiff's functioning progressed over time to where by November 2011 he could perform light duties.   *Id.* (citing Tr. 630-39).   With respect to the State agency opinions, the Commissioner responds the ALJ properly assigned these opinions no weight because they were inconsistent with the medical evidence of record.   *Id.*

Although the Court need not decide this issue since reversal and remand is required as to the first issue discussed above, on remand the ALJ should reconsider

the various opinions of Dr. Schwartz and the State agency consultants and discuss what weight, if any, were given to their opinions.

When determining how much weight to afford an opinion, the ALJ considers whether there is an examining or treatment relationship and the nature and extent thereof; whether the source offers relevant medical evidence to support the opinion; consistency with the record as a whole; the specialization of the source, if any; and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(1)-(6). Findings of fact made by state agency medical and psychological consultants as to the nature and severity of a claimant's impairments must be treated as expert opinion evidence of nonexamining sources by the ALJ, but the ultimate opinions as to whether a claimant is disabled, the severity of a claimant's impairments, the claimant's RFC and the application of vocational factors are exclusively reserved to the Commissioner. SSR 96-6p; 20 C.F.R. § 404.1527(d)(1)-(2). Unless a treating source's opinion is given controlling weight, the ALJ must explain the weight given to the opinions of other consultants, doctors or medical specialists. 20 C.F.R. § 404.1527(e)(2); *Vuxta v. Comm'r of Soc. Sec.*, 194 F. App'x 874, 877 (11th Cir. 2006).

In the Eleventh Circuit, the law is clear that "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 630 F.3d 1176, 1179 (11th Cir. 2011) (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987)). The court reiterated in *Winschel*, "[i]n the absence of such a statement, it is impossible for a reviewing court to determine

whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." 630 F.3d at 1179 (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981)). An ALJ who fails to "state with at least some measure of clarity the grounds for his decision" cannot be affirmed because the court cannot perform its duty to "scrutinize the record as a whole to determine whether the conclusions reached are rational." 630 F.3d at 1179 (citations omitted).

As detailed above and need not be repeated here, Dr. Schwartz's treatment of Plaintiff was extensive and over a period of nearly five years. It included many recommendations and opinions concerning Plaintiff's progress, recommended treatment, and ability to progress to weight-bearing and, ultimately, light duty work. On the other hand, the ALJ's discussion of these records is brief, and he offered no discussion whatsoever of Dr. Schwartz's opinions or the weight to which he ascribed them. Tr. 20. The total extent of the ALJ's discussion of the medical records concerning Plaintiff's physical impairments, some of which were, without stating his name, from Plaintiff's surgeon, Dr. Schwartz, are as follows:

> The claimant was injured on the job in March 2008. He broke both ankles, several bones in his feet, and knocked out several teeth (Exhibits 1F and 15F). Following the accident, he was in a wheelchair for six months. He[] had surgery in 2009 and again confined to a wheelchair for several months. In July 2010, his surgeon fused the ankle (Exhibits 2F and 14F). During 2010, he was in and out of wheelchair. W[orker's ]C[ompensation] reported that the claimant had reached maximum medical improvement on January 26, 2011 (Exhibit 18F /11 ).

> Medical records from Orthopedic Specialists of SWFL documents the claimant has undergone physical therapy and injections for pain. The most recent treatment notes from February 2013 show that the claimant presented with mild right ankle pain. X-rays of the right ankle showed some early ankle osteoarthritis with subtalar arthrodesis, which is solid

in nature. X-rays of the left ankle showed Well osteotomies, which were well healed. Alignment of the foot was appropriate (Exhibits 8F, 12F, 16F, l 7F, 18F, 19F and 21F).

Tr. 20.

Although the ALJ discussed, briefly, the opinion of the state agency consultant, and offered some explanation for the weight afforded to his opinion, he failed to state with at least some measure of clarity the weight afforded to Schwartz's opinions. Tr. 20. The ALJ must articulate his opinion with sufficient clarity and specificity for the Court to determine that the decision is rational and supported by substantial evidence. "The ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179 (internal citation omitted). "Therefore, when the ALJ fails to state with at least some measure of clarity the grounds for his decision, we will decline to affirm simply because some rationale might have supported the ALJ's conclusion." *Id.* (internal quotations and citation omitted). Accordingly, the Court finds that the RFC is not supported by substantial evidence and, under the holding of *Winschel*, remand is required.

Finally, the undersigned finds that the Court need not address any further issues raised by Plaintiff because the Commissioner's analysis may change based on a reconsideration of the aforementioned issues.

## VI.    Conclusion

Upon review of the record, the undersigned concludes that for the reasons cited in the Order, the ALJ failed to apply the proper legal standards and the ALJ's

decision is not supported by substantial evidence. Therefore, the ALJ's decision should be reversed and the case remanded.

Plaintiff requests that the Court remand the case to an administrative law judge other than ALJ Larry Butler, as ALJ Butler is subject to ongoing disciplinary proceedings by the Commissioner, some of which allegations concern cases in which Plaintiff's counsel was involved. Doc. 14 at 15-21. In order to avoid any appearance or risk of actual bias or prejudgment, the case should be reheard by a different ALJ. *See Withrow v. Larkin*, 421 U.S. 35, 47 (1975).

ACCORDINGLY, it is hereby

**ORDERED:**

1. The decision of the Commissioner is **REVERSED** and this matter is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g); for the Commissioner to:

> A. explicitly consider whether Plaintiff meets Listings 1.02A and 1.03 and Plaintiff's ability to ambulate fully under Section 1.00 and sufficiently explain the reasoning;

> B. specifically address Schwartz's opinions, and sufficiently explain the weight given to his opinions;

> C. reevaluate Plaintiff's RFC assessment to determine whether it should include nonexertional limitations or the need for an assistive device; and

> D. conduct any further proceedings deemed appropriate.

2. The Commissioner shall reassign the case for rehearing to an Administrative Law Judge other than Administrative Law Judge Larry Butler.

3.    The Clerk of Court is directed to enter judgment in favor Plaintiff, Patrick Pyjek, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida on this 22nd day of June, 2017.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of record